1

2

THE HONORABLE JOHN C. COUGHENOUR

3

4

5

6

7

8
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11
PUGET SOUNDKEEPER ALLIANCE,
SIERRA CLUB, IDAHO CONSERVATION
LEAGUE, and MI FAMILIA VOTA,
                              Plaintiffs,

12

13
        v.

14
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, ANDREW
WHEELER, in his official capacity as
Administrator of the United States
Environmental Protection Agency, UNITED
STATES ARMY CORPS OF ENGINEERS,
and R.D. JAMES, in his official capacity as
Assistant Secretary of the Army for Civil
Works,
                              Defendants.

15

16

17

18

19

No. 2:20-cv-00950-JCC

**PATAGONIA WORKS' MOTION TO INTERVENE**

**NOTE ON MOTION CALENDAR: FRIDAY, SEPTEMBER 4, 2020**

20

21

22

23

24

25

26

*Patagonia Works' Motion to Intervene - (2:20-cv-00950-JCC)*

**CASCADIA LAW GROUP PLLC**
1201 Third Avenue, Suite 320 Seattle, WA 98101
Tel: (206) 292-6300 Fax: (206) 292-6301

# I. RELIEF REQUESTED

Pursuant to Federal Rule of Civil Procedure 24, Patagonia Works (Patagonia or the Company) moves the Court for an Order allowing it to intervene in this action because The Navigable Waters Protection Rule: Definition of "Waters of the United States," 85 Fed. Reg. 22250 (Apr. 21, 2020) ("Navigable Waters Rule") will harm Patagonia's mission to preserve our home planet, business interest in prospering rural communities, and financial interest in water-based recreation. Counsel representing Plaintiffs and counsel representing Defendants have each confirmed that they do not oppose Patagonia's intervention. Declaration of Stephen J. Tan in Support of Patagonia Works' Motion to Intervene (Tan Decl.) ¶ 2.

# II. ISSUES PRESENTED

This motion presents the following issues:

1. Whether Patagonia Works has a right to intervene in this action pursuant to Federal Rule of Civil Procedure 24(a).

2. Alternatively, whether Patagonia Works should be permitted to intervene pursuant to Federal Rule of Civil Procedure 24(b).

# III. STATEMENT OF FACTS

**A. The Clean Water Act and "Waters of the United States"**

In 1972, Congress passed the Federal Water Pollution Control Act, known as the "Clean Water Act" (CWA or Act), Public Law 92-500 (1972), "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Its stated goal in passing the Act was to eliminate the discharge of pollutants into "navigable waters" and to have waters of such quality that they would be both fishable and swimmable by the mid-1980s. 33 U.S.C. § 1251(a)(1),(2).

The CWA is "the nation's single most important statute for protecting America's clean water against pollution, degradation, and destruction." Clean Water Rule: Definition of

"Waters of the United States," 80 Fed. Reg. 37053, 37055 (June 29, 2015) (Clean Water Rule). Its jurisdictional scope is "navigable waters," statutorily defined as "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).[1]

The U.S. Environmental Protection Agency and the U.S. Army Corps of Engineers ("the Defendant Agencies") have defined the scope of "waters of the United States" (WOTUS) through regulation. *See* 85 Fed. Reg. 22250 (April 21, 2020). WOTUS was historically defined to include traditional navigable waters, interstate waters, all other waters that could affect interstate or foreign commerce, impoundments of waters of the United States, tributaries, the territorial seas, and adjacent wetlands. *See, e.g.*, 44 Fed. Reg. 32854 (June 7, 1979); 51 Fed. Reg. 41250 (Nov. 13, 1986).

Since 1985, the Supreme Court has considered the breadth of "navigable waters"—of WOTUS—three times. On each occasion, it recognized the phrase includes more than waters traditionally understood to be navigable. In *United States v. Riverside Bayview Homes*, the Court considered whether a wetland abutting a navigable creek was protected under the CWA. 474 U.S. 121, 131, 133–34, 106 S. Ct. 455 (1985). Noting Congress defined the waters covered by the Act "broadly" and that the qualifier "navigable" had "limited import," the Court deferred to the Defendant Agencies' determination that wetlands adjacent to traditional navigable waters are "inseparably bound up" with and therefore also constitute WOTUS. *Id.* at 133, 135.

In *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers* (*SWANCC*), the Court considered whether ponds that had formed naturally after a sand and gravel pit was abandoned constituted WOTUS. 531 U.S. 159, 172, 121 S. Ct. 675 (2001). It concluded the use of these "nonnavigable, isolated, intrastate waters" by migrating birds was,

---

[1] The Act prohibits the discharge of (a) any pollutant and dredged or fill material into navigable waters without a permit under Sections 401, 402, and 404, *id.* at § 1341, 1342, 1344, and (b) oil and other hazardous substances into navigable waters under Section 311, *id.* at § 1321. The Act also requires states to establish water quality standards and pollutant limitations for navigable waters within their borders under Section 303. *Id.* at § 1321.

standing alone, insufficient for the ponds to fall within the jurisdiction of the CWA. *Id*. at 172, 174.

Five years later, the Court decided *Rapanos v. United States*, 547 U.S. 715, 126 S. Ct. 2208 (2006), with a 4-1-4 split. The Court considered whether wetlands adjacent to tributaries of traditional navigable waters are WOTUS and "whether a manmade berm separating a wetland from the adjacent tributary makes a difference." *Id*. at 787. The plurality opinion, written by Justice Scalia, asserted that wetlands not abutting navigable waters are nonetheless covered under the Act if (1) the adjacent channel is a "relatively permanent, standing or continuously flowing bod[y] of water forming [a] geographic feature[] … described in ordinary parlance as [a] stream[], ocean[], river[], [or] lake[]" but not a "channel[] through which water flows intermittently or ephemerally, [nor a] channel[] that periodically provide[s] drainage for rainfall, and (2) "the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." *Id*. at 739, 742 (internal punctuation omitted).

Justice Kennedy wrote a concurring opinion in which he asserted that "a water or wetland must possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made" to fall within the jurisdiction of the CWA. *Id*. at 759, 767 (citing *SWANCC*, 531 U.S. at 167, 172). He explained that wetlands possess the requisite significant nexus if, in keeping with the CWA's purpose, they, "either alone or in combination with similarly situated [wet]lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id*. at 780.

Every circuit court since *Rapanos* that has evaluated whether a waterbody is covered by the CWA has applied Justice Kennedy's more inclusive test.[2] This universally-recognized

---

[2] *See U.S. v. Robertson*, 875 F.3d 1281, 1292 (9th Cir. 2017) (concluding the CWA applied to waters that defendant filled without a permit under Justice Kennedy's test, which controlled because it narrowed federal authority less than Justice Scalia's test) *, vacated on other grounds*, 139 S. Ct. 1543, 203 L. Ed. 2d 708 (2019)

interpretation of *Rapanos* was anticipated by Justice Stevens in his dissenting opinion in that case, in which he noted the CWA extends to all "cases in which *either* the plurality's or Justice Kennedy's test is satisfied" and predicted that, for most cases, "Justice Kennedy's approach will be controlling … because it treats more of the Nation's waters as within the [EPA's and the] Corps' jurisdiction[.]" *Id*. at 810 n. 14 (emphasis added).

In 2014, at the Supreme Court's suggestion, the Defendant Agencies formulated a new WOTUS rule informed by "the text of the CWA, Supreme Court decisions [in *Riverside Bayview Homes*, *SWANCC*, and *Rapanos*], the best available peer-reviewed science, public input, and the [Defendant A]gencies' technical expertise and experience in implementing the statute." 79 Fed. Reg. 22188, 37055 (April 21, 2014). After holding more than 400 meetings across the country, considering more than one million public comments, and evaluating more than 1,200 peer-reviewed publications to determine which waters have a significant nexus with traditional navigable waters because of the chemical, physical, or biological functions they provide to downstream waters, the Defendant Agencies published the Clean Water Rule. 80 Fed. Reg. 37053, 37057. The Clean Water Rule defined which waters are jurisdictional by rule, which require a case-specific analysis, and which categorically do not constitute WOTUS. *Id*. at 37057.[3]

_____

(citing *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 999–1000 (9th Cir. 2007) (concluding Kennedy's test controlled because "[h]is concurrence is the narrowest ground to which a majority of the Justices would assent if forced to choose in almost all cases")); *Orchard Hill Building v. U.S. Army Corps of Engineers*, 893 F.3d 1017, 1021 (7th Cir. 2018) ("Justice Anthony Kennedy's concurrence controls."); *Precon Development Corp., Inc. v. U.S. Army Corps of Engineers*, 633 F.3d 278, 288 (4th Cir. 2011); *U.S. v. Donovan*, 661 F.3d 174, 180 (3d Cir. 2011); *U.S. v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009); *U.S. v. Cundiff*, 555 F.3d 200, 210 (6th Cir. 2009); *Simsbury-Avon Preservation Club, Inc. v. Metacon Gun Club Inc.*, 575 F.3d 199, 216–17 (2d Cir. 2009); *U.S. v. Lucas*, 516 F.3d 316, 327 (5th Cir. 2008); *U.S. v. Robison*, 505 F.3d 1208, 1222 (11th Cir. 2007); *U.S. v. Johnso*n, 467 F.3d 56, 66 (1st Cir. 2006); *U.S. v. Gerke Excavating, Inc.,* 464 F.3d 723, 725 (7th Cir. 2006).

[3] The Clean Water Rule defined WOTUS as always including:
   (1) "traditional navigable waters, interstate waters, and territorial seas";
   (2) "tributaries," defined as "waters that are characterized by the presence of physical indicators of flow—bed and banks and ordinary high water mark—and that contribute flow directly or indirectly to a traditional navigable water, an interstate water, or the territorial seas" (*i.e.*, headwater streams and some ditches but not gullies, rills, or ephemeral streams that do not exhibit the features of a tributary); and
   (3) "adjacent waters" (including wetlands, ponds, lakes, oxbows, impoundments, and similar water features) defined as those "bordering, contiguous, or neighboring" other [WOTUS] and

**CASCADIA LAW GROUP PLLC**
1201 Third Avenue, Suite 320 Seattle, WA 98101
Tel: (206) 292-6300 Fax: (206) 292-6301

1    In 2015, the White House issued a press release citing the economic benefits of the

2  Clean Water Rule. It recognized that "[m]ajor economic sectors—from manufacturing and

3  energy production to agriculture, food service, tourism, and recreation—depend on clean water

4  to function and flourish." McCarthy, Gina, and Jo-Ellen Darcy, "Reasons We Need the Clean

5  Water Rule" (May 27, 2015) ("McCarthy Analysis"),

6  https://obamawhitehouse.archives.gov/blog/2015/05/27/reasons-we-need-clean-water-rule

7  (last visited Aug. 18, 2020).

8    On February 28, 2017, President Trump issued an Executive Order entitled,

9  "Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the 'Waters of

10  the United States Rule," which instructed the Defendant Agencies to rescind or revise the

11  Clean Water Rule and to replace it with a rule relying on Justice Scalia's language from

12  *Rapanos*. Exec. Ord. No. 13778, 82 Fed. Reg. 12497 (Feb. 28, 2017). After first publishing a

13  rule postponing the Clean Water Rule's effective date to February 6, 2020, the Defendant

14  Agencies repealed the Clean Water Rule entirely and restored the prior regulations until they

15  could publish new language consistent with President Trump's Order. 83 Fed. Reg. 5200

16  (Feb. 6, 2018); "Definition of Waters of the U.S.: Recodification of Pre-Existing Rules,"

17  (the "Repeal Rule") 84 Fed. Reg. 56626 (Oct. 22, 2019).

18    On June 22, 2020, the Defendant Agencies' new replacement for the Clean Water

19  Rule took effect. *See* 85 Fed. Reg. 22250. The Navigable Waters Rule limits WOTUS to

20  "territorial seas and traditional navigable waters; perennial and intermittent tributaries that

21  contribute surface water flow to such waters; certain lakes, ponds, and impoundments of

---

including those separated from other [WOTUS] by "constructed dikes or barriers, natural river
berms, beach dunes, [or] the like."
*Id*. at 37058. It identified waters requiring a case-specific analysis to determine if a significant nexus exists to
include Prairie potholes, Carolina and Delmarva bays, pocosins, western vernal pools in California, Texas
coastal prairie wetlands, waters within the 100-year floodplain of other [WOTUS], and waters within 4,000 feet
of the high tide line or the ordinary high water mark of other [WOTUS]. *Id*. at 37059. The Defendant Agencies
maintained all prior exclusions and added some more. For example, the Clean Water Rule continued to exclude
waste treatment systems from the definition of WOTUS. *Id.* The Clean Water Rule had an intended effective
date of August 28, 2015. *Id.* at 37053.

1      In 2015, the White House issued a press release citing the economic benefits of the

2 Clean Water Rule. It recognized that "[m]ajor economic sectors—from manufacturing and

3 energy production to agriculture, food service, tourism, and recreation—depend on clean water

4 to function and flourish." McCarthy, Gina, and Jo-Ellen Darcy, "Reasons We Need the Clean

5 Water Rule" (May 27, 2015) ("McCarthy Analysis"),

6 https://obamawhitehouse.archives.gov/blog/2015/05/27/reasons-we-need-clean-water-rule

7 (last visited Aug. 18, 2020).

8      On February 28, 2017, President Trump issued an Executive Order entitled,

9 "Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the 'Waters of

10 the United States Rule," which instructed the Defendant Agencies to rescind or revise the

11 Clean Water Rule and to replace it with a rule relying on Justice Scalia's language from

12 *Rapanos*. Exec. Ord. No. 13778, 82 Fed. Reg. 12497 (Feb. 28, 2017). After first publishing a

13 rule postponing the Clean Water Rule's effective date to February 6, 2020, the Defendant

14 Agencies repealed the Clean Water Rule entirely and restored the prior regulations until they

15 could publish new language consistent with President Trump's Order. 83 Fed. Reg. 5200

16 (Feb. 6, 2018); "Definition of Waters of the U.S.: Recodification of Pre-Existing Rules,"

17 (the "Repeal Rule") 84 Fed. Reg. 56626 (Oct. 22, 2019).

18      On June 22, 2020, the Defendant Agencies' new replacement for the Clean Water

19 Rule took effect. *See* 85 Fed. Reg. 22250. The Navigable Waters Rule limits WOTUS to

20 "territorial seas and traditional navigable waters; perennial and intermittent tributaries that

21 contribute surface water flow to such waters; certain lakes, ponds, and impoundments of

22 ────────────────

23      including those separated from other [WOTUS] by "constructed dikes or barriers, natural river berms, beach dunes, [or] the like."

24 *Id*. at 37058. It identified waters requiring a case-specific analysis to determine if a significant nexus exists to include Prairie potholes, Carolina and Delmarva bays, pocosins, western vernal pools in California, Texas coastal prairie wetlands, waters within the 100-year floodplain of other [WOTUS], and waters within 4,000 feet

25 of the high tide line or the ordinary high water mark of other [WOTUS]. *Id*. at 37059. The Defendant Agencies maintained all prior exclusions and added some more. For example, the Clean Water Rule continued to exclude

26 waste treatment systems from the definition of WOTUS. *Id*. The Clean Water Rule had an intended effective date of August 28, 2015. *Id*. at 37053.

jurisdictional waters; and wetlands adjacent to jurisdictional waters." *Id*. at 22251. It excludes waters from the definition of WOTUS that the Clean Water Rule, in keeping with the CWA, Supreme Court precedent, and science, included.

**B. Substance of This Action.**

Plaintiffs challenge the Navigable Waters Rule and the Repeal Rule on the grounds that each is contrary to the CWA and violates the Administrative Procedures Act (APA), 5 U.S.C. § 706(2).

**C. Identity of Prospective Intervenor Patagonia Works.**

1. Corporate Identity and Mission.

Patagonia Works is a holding company for Patagonia, Inc., an outdoor apparel and equipment retailer; Patagonia Provisions, a purveyor of sustainably-produced food products; Tin Shed Ventures, a venture capital fund; and Worn Wear, Inc., Patagonia's used clothing business. Declaration of Lisa Pike Sheehy in Support of Patagonia Works' Motion to Intervene (Sheehy Decl.) ¶ 3. The Company is a prominent member of the national outdoor recreation economy, which employs 7.6 million people and, in 2017, generated $887 billion in revenue, including $65.3 billion in federal tax revenue and $59.2 billion in state and local tax revenue. *Id*. ¶ 6. Headquartered in Ventura, California, Patagonia operates stores across the United States. *Id*. ¶ 4. As reflected by the Company's mission statement that it is "in business to save our home planet" and by its 40-year history of environmental activism, conservation is a core business tenet. *Id*.

In 2012, Patagonia enshrined its blended goals of business success and environmental protection into its Articles of Incorporation and registered as a California benefit corporation. *Id*. This status requires the Company to: (a) contribute one percent of its annual net revenue to non-profit charitable organizations that promote environmental conservation and sustainability; (b) create a material positive impact on society and the environment, and

(c) consider the impact of any action on its workforce, its customers, and the environment. *Id.*; *see also* Cal. Corp. Code §§ 14600 *et seq.* Patagonia also applied for and received "B Corp" certification from the non-profit organization B Lab. *Id.* at ¶ 5. The Company has procured this voluntary certification each year since 2012, which requires it to submit to an annual assessment of its performance on dozens of measures of social and environmental performance, accountability, and transparency. *Id.* Among B Corp-certified companies, Patagonia consistently scores the highest in "Civic Engagement and Giving." *Id.* In 2019, B Lab recognized Patagonia as a "Best in the World Honoree" in the Community, Environment, and Overall categories. *Id.*

       2. <u>Financial Support, Advocacy, and Grassroots Mobilization for Environmental Causes</u>.

Beginning in 1985, Patagonia committed to donating at least 1% of its gross sales to environmental issues. *Id.* ¶ 8. The Company has since donated more than $100 million to grassroots environmental groups, including 2,914 grants totalling almost $21 million in support of 995 groups all over the United States who are fighting to protect clean water. *Id.* ¶ 9. Patagonia also encourages its customers and other companies to support environmental causes and to act sustainably. *See id.* ¶ 8. In 2002, founder Yvon Chouinard created the non-profit organization 1% For The Planet, through which 4,000 companies have donated more than $265 million. *Id.*

In addition to financial support, Patagonia engages in direct legislative advocacy to lobby for and bring attention to the need for clean water outdoors and indoors. These efforts have included lobbying for permanent funding of the Land and Water Conservation Fund, for greater protection of the Great Lakes and Boundary Waters in the Upper Midwest, for implementation of conservation projects in the Florida Everglades, for preservation of flows through the Colorado River Delta, and for measures to protect drinking water in Flint, Michigan. *Id.* ¶ 11.

Finally, Patagonia engages in active efforts to educate the public, to mobilize support for environmental conservation causes, and to enable environmental groups and individuals to connect on issues they care about. The Company blog serves as a long-form storytelling platform to educate and mobilize support for healthy river ecosystems. *Id*. at ¶ 12. Blog posts include, "Why the Clean Water Act Means So Much"; "A World Without Salmon"; and "Putting Water Back: How Can We Remedy our Past Mistakes?" *Id*. Patagonia Action Works, created in 2018, connects Patagonia's customers with its grantees, offering grantees an opportunity to obtain skilled volunteers, financial donations, and to advertise events through Patagonia's social media presence. Groups currently using the Action Works platform include the Waterkeeper Alliance, Clean Water Fund, and Earth Island Institute/Clean Water Advocacy. *Id*. ¶ 18.

3. Patagonia's Previous Efforts to Challenge the Navigable Waters Rule.

On April 15, 2019, Patagonia submitted formal Comments to the EPA regarding the Defendant Agencies' proposed changes to the Clean Water Rule. *Id*. ¶ 13, Sheehy Decl. Ex. A. In its Comments, Patagonia, citing data maintained by the U.S. Geological Survey, noted that approximately 60% of stream miles within the continental United States are intermittent or ephemeral, 18% of streams are considered ephemeral, and 51% of wetlands do not abut or have a direct hydrologic surface connection to other surface waters. Sheehy Decl. Ex. A at 27-28. It warned that "[e]liminating the protection for [these streams and] thousands of acres of wetlands will have devastating effects on water quality and the environment." *Id*. at 24–25.

On January 23, 2020, in response to publication of the Navigable Waters Rule, Patagonia's CEO Rose Marcario issued a public statement on Twitter in which she responded to the rollback of the Clean Water Rule. She stated:

> President Trump just removed protections for tributaries and wetlands in your community. This comes after polluting your air, putting your public lands under threat[,] and ignoring the climate crisis. Make sure you are registered to vote today, make a voting plan, and show up in November to stop the pillaging of our planet.

The statement closed with a call to action for Patagonia's 475,000 followers to urge their members of Congress to prevent the EPA from weakening the Clean Water Act. Sheehy Decl. ¶ 16, Ex. C.

On February 22, 2020, the public affairs website The Hill published an op-ed co-authored by Patagonia's Environmental Advocate Avi Garbow, in which he asserted that the Navigable Waters Rule "drastically reduces the ability of the Clean Water Act to protect waters from pollution and destruction, gutting essential protections that safeguard the drinking water of the American people and the waters they swim and fish in." Sheehy Decl. ¶ 17, Ex. D. Mr. Garbow urged that the Rule "be struck down in the courts because it is out of step with the law, the expectations of the American people, and the science that supports our environmental protection." Sheehy Decl. Ex. D.

Last, Patagonia is running an ongoing campaign on its Action Works platform called "Save the Clean Water Act," which encourages the public to submit comments directly to the EPA and EPA Administrator Andrew Wheeler that advocate for a broader definition of WOTUS under the CWA and protecting certain waterways. Sheehy Decl. ¶ 18.

4. Patagonia's Fish Business Unit.

Patagonia manufactures and sells a broad range of apparel and gear to a broad spectrum of outdoor recreationalists. A subset of these products fall within Patagonia's Business Unit – Fly Fishing, which creates and sells technical apparel and outerwear, fishing packs and duffles, waders, wading boots, and angling accessories for flyfishers. Consumers of these products typically also purchase other Patagonia gear and apparel that are produced and managed internally through other Patagonia business units. Declaration of Edward Manning in Support of Patagonia Works' Motion to Intervene (Manning Decl.) ¶¶ 3, 4.

Patagonia sells its gear and apparel through its website (www.Patagonia.com) and in over seventy Patagonia stores worldwide, the majority of which are located in the United States. In addition, Patagonia sells its gear and apparel to over 250 small and medium-sized

specialty flyshops and outdoor retailers, the vast majority of which are located in rural communities in proximity to waters that provide fish habitat and fishing and other recreation opportunities. Manning Decl. ¶ 5. For example, Patagonia sells gear and apparel from its Business Unit – Fly Fishing and from other non-flyfishing business units to nine dealers in Washington. Manning Decl. ¶ 5. The viability of these business accounts is highly dependent on the dealers' proximity to clean fishable waters. Manning Decl. ¶ 6.

### IV. ARGUMENT AND AUTHORITY

**A. Patagonia Has the Right to Intervene Under Rule 24(a).**

A district court must grant intervention under Rule 24(a)(2) to anyone who satisfies a four-factor test. The applicant must demonstrate (1) a "significantly protectable" interest relating to the property or transaction that is the subject of the action; (2) the existing parties to the action cannot adequately represent the applicant's interest; (3) disposition of the action without the applicant's participation as a party may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's motion must be timely. *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998); *Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1061 (9th Cir. 1997).

The Court should interpret these requirements "broadly[,] … in favor of intervention," as its analysis should be "guided primarily by practical and equitable considerations." *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004). This "liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1179 (9th Cir. 2011) (quotations and citation omitted).

1. Patagonia Has Significantly Protectable Interests in the Subject of this Action.

For the purposes of Rule 24(a), a "significantly protectable interest" exists where "the [claimed] interest is protectable under some law [and] there is a relationship between the

legally protected interest and the claims at issue." *Wilderness Soc'y*, 630 F.3d at 1176

(quoting *Sierra Club v. EPA*, 995 F.2d 1478, 1484 (9th Cir. 1993)). Because "the interest

test is primarily a practical guide to disposing of lawsuits by involving as many apparently

concerned persons as is compatible with efficiency and due process," this element of

Rule 24(a) does not require a prospective intervenor to establish or even identify a "specific

legal or equitable interest." *Wilderness Soc'y*, 630 F.3d at 1179 (quoting *County of Fresno v.

Andrus*, 622 F.2d 436, 438 (9th Cir. 1980)).

This case implicates three significantly protectable interests held by Patagonia: (a) its

mission to preserve the integrity of wild, natural landscapes and, in particular, riverine and

riparian ecosystems; (b) its mutually-beneficial interest in vibrant, sustainable rural economies

and the communities that depend on them; and (c) its business interest in outdoor recreation

and, more specifically, revenues from sales of clothing and products purchased by hikers,

flyfishers, and other recreational users of the areas that would be adversely affected by the

Navigable Waters Rule.

*a. Patagonia's interest in environmental conservation*

If the Navigable Waters Rule stands, it will undermine Patagonia's mission to "save

the home planet" and will undo decades of the Company's efforts to protect freshwater

aquatic ecosystems throughout the United States. Numerous courts have recognized that

interests of this type are sufficient to support intervention. *See, e.g., Citizens for Balanced Use

v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897, 2011 (9th Cir. 2011) (finding conservation-

oriented groups had "a significant protectable interest in conserving and enjoying the

wilderness character of the Study Area" at issue); *United States v. Carpenter*, 526 F.3d 1237,

1240 (9th Cir. 2008) (concluding conservation groups were entitled to intervene because they

had an interest in preserving the wilderness area for the use and enjoyment of their members);

*Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983) (granting the National

Audubon Society the right to intervene in a suit challenging the actions of the Interior

Secretary that would impair a bird conservation area); *see also WildEarth Guardians v. Nat'l Park Serv.*, 604 F.3d 1192, 1198 (10th Cir. 2010) (characterizing a conservation group's environmental concerns as an "indisputable" legally protectable interest) (quoting *San Juan County v. United States*, 503 F.3d 1163, 1199 (10th Cir. 2007)).

Patagonia's financial support, advocacy, and grassroots mobilization efforts substantiate its interest in a robust Clean Water Act and justify its intervention in this action. Patagonia's decision to submit Comments to the Defendant Agencies raising objections to and concerns regarding the Navigable Waters Rule and encouraging its customers to do the same particularly demonstrates its interest in protecting WOTUS. *See, e.g.*, *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 526–27 (9th Cir. 1983) (organization granted intervention as of right when it "participated actively in the administrative process"); *Idaho Farm Bureau Fed'n*, 58 F.3d at 1397 (applicant deemed "entitled as a matter of right" to intervene in a challenge to the legality of a measure it has supported); *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,* 624 F.3d 1083, 1088 (9th Cir. 2010) (intervention proper where litigation would frustrate prospective intervenor's historical advocacy efforts); *Washington State Bldg. & Constr. Trades Council v. Spellman*, 684 F.2d 627 (9th Cir. 1982) (advocacy group that had sponsored antinuclear statute had sufficient interest in suit challenging that statute).

### b. Patagonia's interest in sustainable rural economic development

Patagonia sells outdoor apparel and gear to hundreds of specialty flyshops and outdoor retailers located in rural communities. Manning Decl. at ¶ 5. It has a mutually-beneficial business interest in the sustainable economic development of these communities. *Id*. at ¶¶ 5, 6. If clean water for outdoor recreation is no longer accessible to Patagonia's customers and others, the economy of these rural communities and Patagonia's sales there will shrink.

The Company has spoken out about the negative economic impacts of the Navigable Waters Rule. *See* Patagonia's Comments to the EPA, citing adverse impacts on the "Outdoor

Recreation Economy," and the Company's Environmental Advocate's op-ed urging opposition to the Navigable Waters Rule, characterizing clean water as "an economic necessity." Sheehy Decl., Exs. A, D. The Company's concerns reflect the goals of the Clean Water Rule, including the assertion made by the White House in 2015 in support of that Rule: the recreational economy "depend[s] on clean water to function and flourish." McCarthy Analysis, at https://obamawhitehouse.archives.gov/blog/2015/05/27/reasons-we-need-clean-water-rule.

### c. Patagonia's financial interest

An entity whose commercial interests and profitability will likely be adversely affected by an unfavorable outcome in a case is entitled to intervene under Rule 24(a)(2), if such interests are not shared by existing parties to the action. For example, in *County of St. Louis v. Thomas*, 162 F.R.D. 583 (D. Minn. 1995), an outdoor recreation company succeeded in intervening in a challenge to restrictions on visitor use of the Boundary Waters wilderness area. The court noted:

> Wilderness Inquiry, Inc., is a profit-oriented business which provides "integrated wilderness adventures" for its clients, who seek "a true wilderness experience, rather than a wilderness trip modified for people with disabilities," and who would be less likely to utilize Wilderness Inquiry's services if the Defendants' restrictions are sustained resulting in a probable financial loss to the company.

*Id.* at 587 n. 12 (quoting an affidavit). It then ruled that these interests, and the company's earlier administrative participation, justified intervention under Rule 24(a).

This principle has been routinely recognized by courts evaluating motions to intervene. *See, e.g., County of San Miguel v. MacDonald*, 244 F.R.D. 36, 47–48 (D.D.C. 2007) (in a suit by county and environmental groups over an Endangered Species Act (ESA) listing determination, recognizing trade organization's interest in protecting members' business operations and economic livelihoods); *People for Ethical Treatment of Animals v. Babbitt*, 151 F.R.D. 6, 7–8 (D.D.C. 1993) (in a suit by an animal-rights group alleging the government violated the ESA by allowing a performer to use orangutans in a nightclub act, recognizing

performer's economic interest in preserving his right to do so); *Natural Resources Defense Council, Inc. v. Envtl. Prot. Agency*, 99 F.R.D. 607, 610 (D.D.C. 1983) (in suit challenging EPA's reforms of pesticide regulations, recognizing pesticide manufacturers' financial interest in continued registration of their pesticide products); *Natural Res. Def. Council v. Costle*, 561 F.2d 904, 912 (D.C. Cir. 1977) (same).

In its Comments on the Navigable Waters Rule, Patagonia noted that the ephemeral streams that the Rule's definition of WOTUS removed from CWA jurisdiction are "the very streams that feed the waters anglers rely upon for trout and other fisheries." Sheehy Decl. Ex. A at 29. Through its Business Unit – Fly Fishing and other retail divisions, Patagonia sells clothing, equipment, and other gear to recreational users of these streams. Manning Decl. ¶¶ 3–5. The environmental impairment of these habitats would, without question, adversely affect consumer demand for and sales of these products.

2. The Existing Parties Cannot Adequately Protect Patagonia's Unique Interests.

An intervenor is adequately represented only if "(1) the interests of a present party to the suit are such that it will undoubtedly make all of the intervenor's arguments; (2) the present party is capable of and willing to make such arguments; and (3) the intervenor would not offer any necessary element to the proceedings that the other parties would neglect." *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003), *as amended* (May 13, 2003). In other words, the proper test of adequate representation is whether each of the dual interests may "always dictate precisely the same approach to the conduct of the litigation." *Trbovich v. United Mine Workers of Am.,* 404 U.S. 528, 539, 92 S. Ct. 630 (1972). Where "multiple interests have the potential of dictating a different approach to the conduct of the litigation," intervention is justified. *United Guar. Residential Ins. Co. of Iowa v. Philadelphia Sav. Fund Soc'y*, 819 F.2d 473, 475–76 (4th Cir. 1987). The "most important factor" is, therefore, "'how the interest [claimed by the prospective intervenor] compares with the interests of existing parties.'" *Citizens for Balanced Use v. Mountain Wilderness Ass'n*, 647 F.3d 839, 898 (9th Cir. 2011).

CASCADIA LAW GROUP PLLC
1201 Third Avenue, Suite 320 Seattle, WA 98101
Tel: (206) 292-6300 Fax: (206) 292-6301

"[T]he burden of … showing [inadequate representation] should be treated as minimal." *Trbovich*, 404 U.S. at 538 n. 10.

Plaintiffs, none of whom are for-profit businesses serving outdoor recreationalists, cannot possibly adequately represent Patagonia's private interests in challenging the Navigable Waters Rule. *See McDonald v. Coyle*, 175 F. App'x 947, 949 (10th Cir. 2006) ("Generally, a litigant 'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'") (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 129, 125 S. Ct. 564 (2004)). While Patagonia shares environmental advocacy and conservation goals with plaintiffs, its specific priorities regarding these objectives, and the arguments it will make in furtherance of them, will likely differ. In addition, the fact that Patagonia's individual financial interest is dependent on intact healthy ecosystems and waterways will entitle (and require) it to make arguments that plaintiffs are unable to make, both in support of their case-in-chief and in rebuttal. In such instances, courts have granted the prospective intervenor's motion. *See, e.g., New York Pub. Interest Research Group, Inc. v. Regents of Univ. of N.Y.*, 516 F.2d 350, 352 (2d Cir. 1975) (intervention appropriate where a prospective intervenor "will make a more vigorous presentation of the economic side of the argument than would [an existing party]"); *Puget Soundkeeper All. v. United States EPA*, No. C13-1839-JCC, 2014 U.S. Dist. LEXIS 189913, at *8 (W.D. Wash. Feb. 18, 2014) (granting intervention to private parties where existing parties could not adequately protect private parties' interests).

3. <u>The Disposition of This Action May Impair Patagonia's Ability to Protect Its Interests</u>.

The third requirement for intervention is satisfied if the prospective intervenor "would be substantially affected in a practical sense by the determination made in an action." *Southwest Ctr. For Biological Diversity v. Berg*, 268 F.3d 810, 822 (9th Cir. 2001) (quoting Fed. R. Civ. P. 24 advisory committee's notes). This inquiry "presents a minimal burden."

1   *WildEarth Guardians*, 604 F.3d at 1199. As described above, an adverse decision in this

2   action would impair Patagonia's ability to fulfill its mission and to maintain its profitability.

3       4. <u>Patagonia's Motion is Timely</u>.

4       To determine whether Patagonia's motion is timely, the Court must evaluate (a) the

5   stage of this proceeding; (b) the prejudice intervention would cause to other parties; and

6   (c) the reason for and length of any delay caused by allowing Patagonia to intervene. *United*

7   *States v. Alisal Water Corp.,* 370 F.3d 915 (9th Cir. 2004). "Mere lapse of time alone is not

8   determinative" in deciding the timeliness of a motion to intervene. *County of Orange v. Air*

9   *California*, 799 F.2d 535 (9th Cir. 1986) (citing *United States v. Oregon*, 745 F.2d 550

10  (9th Cir. 1984)).

11      This case is in its earliest stages. Although all parties have formally appeared through

12  counsel, no Answer has yet been filed, and the Court has yet to substantively engage in the

13  issues raised by plaintiffs' Complaint.[4] As such, no credible argument can be made that

14  Patagonia's intervention would cause unreasonable delay or prejudice to any of the parties.

15  *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995) (motion to

16  intervene deemed timely when filed four months after complaint and two months after answer

17  but "before any hearings or rulings on substantive matters"); *Nat. Res. Defense Council v.*

18  *McCarthy*, No. 16-cv-02184-JST, 2016 WL 6520170, at *3 (N.D. Cal. Nov. 3, 2016) (motion

19  deemed timely when filed before an answer and "any substantive orders"). Indeed, Counsel

20  representing Plaintiffs and Defendants have each confirmed that they do not oppose

21  Patagonia's intervention. Tan Decl. ¶ 2. Further, because Patagonia's prospective Complaint

22  in Intervention (attached as Exhibit A to the Tan Decl.) asserts no legal causes of action not

23  already pled and seeks no relief not already requested by existing Plaintiffs, Patagonia's

24  participation in this case will neither complicate the issues nor prolong the litigation.

25  _____

26  [4] At the time of the filing of this Motion, the Court has issued no substantive or procedural rulings. A Motion to Intervene filed by business interests in favor of the Navigable Waters Rule remains pending and has not been ruled upon.

CASCADIA LAW GROUP PLLC
1201 Third Avenue, Suite 320 Seattle, WA 98101
Tel: (206) 292-6300 Fax: (206) 292-6301

**B.     Alternatively, Patagonia Should be Granted Permissive Intervention Under Rule 24(b).**

If the Court finds Patagonia does not satisfy the requirements for intervention as of right, it should grant the Company permission to intervene pursuant to Rule 24(b). "Unlike rule 24(a), a 'significant protectable interest' is not required by Rule 24(b) for intervention; all that is necessary for permissive intervention is that intervenor's 'claim or defense and the main action have a question of law or fact in common.'" *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1108 (9th Cir. 2002) (citing Fed. R. Civ. P. 24(b)).

All matters at issue turn on the same questions of law—whether Defendant Agencies violated the APA and the CWA in enacting the Navigable Waters Rule and the Repeal Rule—and the facts Patagonia will offer to substantiate its claims are consistent with and complement facts likely to be offered by Plaintiffs. For these reasons, Patagonia's "intervention will significantly contribute to . . . the just and equitable adjudication of the legal questions presented." *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977). Accordingly, even if the Court does not grant intervention as of right, permissive intervention is warranted so that Patagonia can continue to protect its interests in accessible clean water. *See, e.g.*, *Puget Soundkeeper All. v. Pruitt*, No. C15-1342-JCC, 2018 U.S. Dist. LEXIS 124517, at *4 (W.D. Wash. July 25, 2018) (granting permissive intervention where prospective intervenor was aligned with existing parties because the prospective intervenor had significant economic and litigation interests at stake).

//
//
//
//
//
//

CASCADIA LAW GROUP PLLC
1201 Third Avenue, Suite 320 Seattle, WA 98101
Tel: (206) 292-6300 Fax: (206) 292-6301

## V. CONCLUSION

For the foregoing reasons, the Court should grant Patagonia's Motion to Intervene under Rule 24.

RESPECTFULLY SUBMITTED this 20th day of August, 2020.

CASCADIA LAW GROUP PLLC

By    s/ Stephen J. Tan
By    s/ Meghan E. Gavin
Stephen J. Tan, WSBA No. 22756
Meghan E. Gavin, WSBA No. 50124
Cascadia Law Group PLLC
1201 Third Avenue, Suite 320
Seattle, WA 98101
Telephone:  (206) 292-6300
Facsimile:   (206) 292-6301
Email:  stan@cascadialaw.com;
         mgavin@cascadialaw.com

Robert D. Tadlock,
   Admission *pro hac vice* Pending
Avi S. Garbow,
    Admission *pro hac vice* Pending
Patagonia, Inc.
259 W. Santa Clara Street
Ventura, CA 93001
Telephone:  (800) 638-6464
Email:  Robert.Tadlock@patagonia.com;
         Avi.Garbow@patagonia.com

Attorneys for Plaintiff-Intervenor
Patagonia Works

**CERTIFICATE OF SERVICE**

I hereby certify that on the 20th day of August, 2020, the foregoing was electronically filed with the Clerk of the Court using the Court's electronic filing system, which will send notification of said filing to the attorneys of record that have, as required, registered with the Court's system.

DATED this 20th day of August, 2020 at Seattle, Washington.

By     s/ Stephen J. Tan
        Stephen J. Tan, WSBA No. 22756
        Cascadia Law Group PLLC
        1201 Third Avenue, Suite 320
        Seattle, WA 98101
        Email:   stan@cascadialaw.com

*Certificate of Service - (2:20-cv-00950-JCC)*

CASCADIA LAW GROUP PLLC
1201 Third Avenue, Suite 320 Seattle, WA 98101
Tel: (206) 292-6300 Fax: (206) 292-6301